UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SWINERTON BUILDERS, *et al.*,

    Plaintiffs,

    v.

AMERICAN HOME ASSURANCE COMPANY, *et al.*,

    Defendants.
_____/

No. C-12-6047 EMC

**ORDER GRANTING DEFENDANTS' MOTION TO STAY ACTION PENDING ARBITRATION AND COMPELLING ARBITRATION**

**(Docket No. 17)**

## I. INTRODUCTION

Plaintiffs in this case are building contractors who have brought suit against their insurance companies American Home Assurance Company and National Union Fire Insurance Company. This suit arises out of a dispute about Defendants' obligations in defending Plaintiffs in an underlying action where Plaintiffs are being sued for alleged defects in a residential building built by Plaintiffs as the general contractor. That suit is ongoing.

On March 15, 2013, this Court granted in part and denied in part Defendant's motion to dismiss Plaintiff's claims for lack of ripeness. Docket No. 31. Though this Court found that some of Plaintiff's claims are ripe, it ordered supplemental briefing on the question of whether the ripe claims are covered by an enforceable arbitration agreement.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Swinerton Builders and Swinerton Inc. were the general contractor for the construction of a residential building known as The Essex located at Lakeside Drive and 17th Street in Oakland, California. Compl. ¶ 18. The building received a certificate of substantial completion

on May 1, 2002, and was subsequently purchased by Essex CAL-WA LP. *Id.* It was later re-sold to Lennar Emerald Merritt Partners, LLC, and the building's units were sold as condominiums. *Id.*

During the relevant period of time, Plaintiffs were covered by two insurance policies. Compl. ¶¶ 13-17. The first, issued by Defendant American Home, was a commercial general liability policy effective from March 31, 2002 to March 31, 2003 ("CGL policy"). Compl. ¶ 13. Plaintiff paid a total of $363,800 in premiums for the policy. Compl. ¶ 15. Plaintiff alleges that the policy has a $100,000 deductible which has been satisfied in the underlying action. *Id.* The second policy, issued by Defendant National Union, was a commercial umbrella policy effective from March 31, 2000 to March 31, 2005 ("umbrella policy"). Compl. ¶ 16. The umbrella policy required Defendant National Union to defend and indemnify Plaintiffs after exhaustion of the CGL policy. Compl. ¶ 17. Both Defendants are wholly owned subsidiaries of American International Group, Inc. ("AIG"). Compl. ¶ 5. AIG and Defendants have appointed another AIG subsidiary, Chartis Inc., to manage and adjust the claims under both policies. Compl. ¶ 6.

In October 2005, Lennar Emerald contacted Plaintiffs and informed them of various problems with the plumbing system at the Essex; it demanded Plaintiffs rectify the problems. Compl. Ex. C. Plaintiffs forwarded a notice of the claim to AIG on October 17, 2005. *Id.*; Compl. ¶ 19. On or about August 18, 2006, the Home Owner's Association for the Essex ("HOA" or "claimant") served Plaintiffs with a Notice to Builder pursuant to California Civil Code § 1375 ("Calderon Notice"). Compl. ¶ 20. The Calderon Notice identified various defects related to water intrusion, deterioration of pipes, cracking, and failure of waterproofing at different locations at the property. *Id.*

On February 10, 2012, the HOA filed suit in Alameda Superior Court against Plaintiffs for construction defects. Compl. Ex. D. The HOA brought various claims, including breach of standards of construction, breach of construction contracts, breach of fiduciary duty, negligence, and breach of implied warranty. *Id.*; Compl. ¶ 26. The HOA has made allegations and provided evidence that subject property damage occurred during the effective periods of the insurance policies at issue. Compl. ¶ 29. Defendants are defending Plaintiffs this suit, but have refused several settlement offers that Plaintiffs consider to be reasonable. Compl. ¶¶ 27, 30.

Plaintiffs also allege that Defendants are in breach of the insurance contracts because they are erroneously claiming that Plaintiffs have not satisfied the policies' deductibles or self-insured retentions. *Id.* Plaintiffs allege that they have already paid $800,000, which is far beyond the policy's $100,000 deductible. *Id.* As a result, Plaintiffs claim that they are entitled to reimbursement of $700,000 these expenses. *Id.* Plaintiffs represent that Defendants have taken the position that each separate defect constitutes a separate claim subject to a separate deductible, and that the deductibles for the various claims have not yet been satisfied. *Id.*

Though the insurance contracts themselves have no arbitration clause, Defendant argues that the dispute about the deductibles is covered by an arbitration clause contained in a Letter of Understanding between the Plaintiffs and Defendant National Union executed in August 2009. Docket No. 19-2. The purpose of that Letter was:

> to outline the process to be followed by Swinerton, Inc. ("Swinerton") and National Union Fire Insurance Company of Pittsburgh, Pa. and its subsidiaries and affiliates . . . to resolve outstanding disputes associated with the 3/31/00-3/31/05 Rolling Contractor Controlled Insurance Program (Swinerton Wrap-Up) and to finalize the 8/01/01-7/31/02 Workers Compensation Program for Swinerton . . . .

*Id.* The Letter detailed the obligations of the parties as to the Wrap-Up and the Worker's Compensation Program, and identified three settlement payments related to the Workers' Compensation Program and two adjustments related to the Wrap Up program. As to the Swinerton Wrap-Up, the Letter acknowledge that "[t]he Swinerton Wrap Up program is not ready to be closed and finalized," and stated:

> Further, Swinerton acknowledges that losses in the Swinerton Wrap Up program have not reached the Basket Aggregate Limit and Swinerton has an obligation to reimburse and fund future paid losses within the program deductible and in accordance with the program up to the Basket Aggregate Limit. Prior to the settlement date, Swinerton will establish a separate (non interest bearing) cash escrow with National Union for the benefit of National Union with an initial deposit of $100,000. On a semi-annual basis National Union will submit an invoice with supporting documentation to Swinerton for any loss payments related to the Swinerton Wrap Up program within the deductible and in accordance with the program. Swinerton will reimburse funds to the escrow account to satisfy submitted invoices. At any point, if the balance in the escrow account falls below $50,000, Swinerton will replenish the escrow account to $100,000 until losses reach the Basket Aggregate Limit. National Union may make a final

United States District Court
For the Northern District of California

> settlement offer to close the Swinerton Wrap Up program at any point in time.

*Id.* Other than the above-quoted language, the Letter does not define the Wrap-Up program or give a clear sense of the program's scope. Neither party provides additional definition or explanation of the Wrap-Up program in their briefs.

The Letter contains an agreement to arbitrate "any dispute between the Parties with reference to the interpretation, application, formation, enforcement or validity of this memorandum, or their right with respect to any transaction involved, whether such dispute arose before or after the termination of this memorandum." *Id.* The arbitration clause further provides that the arbitrators shall have "exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability." *Id.*

Plaintiff contends that the Letter of Understanding does not cover the dispute over the deductibles, and points to another document that it contends is critical to the arbitration question. This document is an unexecuted Payment Agreement from March 2000 between Plaintiffs and Defendants. Docket No. 32-2. This document contains an arbitration clause that would apply to disputes over deductibles, and that Plaintiffs state would have covered the instant dispute had the Payment Agreement been signed. *Id.* at 8, 4; Pl.'s Supp. Br. at 6. Plaintiffs offer the declaration of Swinerton, Inc. Senior Vice President and Director of Risk Services John Capener, who states that he refused to sign the Payment Agreement because it was his practice to refuse to sign any contract with Defendants that would require Plaintiffs to arbitrate disputes over deductibles. Supplemental Declaration of John Capener ("Capener Decl.") ¶¶ 4-7, 9. Capener also states that it was the intention of the parties that the Letter of Understanding would only apply to the specific five transactions identified in the Letter, and not more broadly to disputes about deductibles. *Id.* ¶ 8. Defendants, unsurprisingly, offer the declaration of Senior Vice President of the Construction Risk Management Stephen Lidz, who contends that the Letter was intended to apply more broadly to Plaintiffs' "obligation to reimburse and fund future paid losses within the program deductible." Declaration of Stephen Lidz ("Lidz Decl.") ¶ 8 (Docket No. 33-1).

On February 2, 2013, Defendants filed a motion to dismiss, or in the alternative, to stay this action pending arbitration. In that motion, Defendants argued that Plaintiffs' claims were premature because they are defending Plaintiffs in the underlying action and that action has not yet concluded. In its March 15, 2013 order, this Court found that Plaintiff's claims regarding Defendants' refusal to settle were unripe, but that the claims regarding the deductible dispute were ripe because, according to the allegations in the complaint, these expenses have already been incurred by Defendants and billed to Plaintiffs in violation of the insurance contract. As Plaintiffs contended that it had newly discovered evidence (the unexecuted Payment Agreement) that was relevant to the question of whether the deductibles dispute was subject to arbitration, this Court ordered the parties to submit supplemental briefing on this issue. In Defendants' supplemental brief, they request that in addition to staying this action, this Court should issue an order compelling Plaintiffs to submit to arbitration. Docket No. 33 at 9.

### III. DISCUSSION

The Federal Arbitration Act ("FAA") provides that contractual arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When a dispute covered under an arbitration clause is brought in a suit in federal court, the court must stay the action upon application of any of the parties. 9 U.S.C. § 3. Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). At the same time, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Given this presumption in favor of arbitration, a court should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc.*, 475 U.S. at 650; *see also Momot*, 652 F.3d at 987 ("Given the general presumption in favor of arbitration, one can understand why the law would insist upon clarity before concluding that the parties did not want to arbitrate a related matter.").

A.  Arbitration of the Question of Arbitrability

As a preliminary issue, Defendants argue that the arbitration agreement in the Letter of Understanding evinces an agreement to arbitrate questions of whether a given dispute falls within the scope of the Letter's arbitration clause. Def.'s Supp. Br. at 2. When a party alleges that a dispute is covered by an arbitration agreement, the Court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The Supreme Court has recognized, however, "that parties can agree to arbitrate "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, ––– U.S. –––, ––– n. 1, 130 S.Ct. 2772, 2777 (2010).

In this case, the Letter of Understanding explicitly provides that the parties will arbitrate "any dispute . . . with reference to the *interpretation, application*, formation, enforcement, or validity of this memorandum," and that the arbitrators "will have exclusive jurisdiction over the entire matter in dispute, *including any question as to its arbitrability*." Docket No. 19-2 (emphasis added). In examining the question of whether the question of arbitrability is itself committed to the jurisdiction of the arbitration tribunal, the Court cannot "assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Rent-A-Center*, 130 S.Ct. at 2777 n. 1 (2010) (internal quotation marks and alterations omitted); *see also AT & T Techologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986) (stating that, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by court, not the arbitrator"). The elevated standard of proof on this gateway question obtains because typically and historically the issue of arbitrability is decided by the courts, and the Federal Arbitration Act does not contemplate otherwise. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (stating that, if "the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration"). Thus, the starting presumption is that arbitrability is an issue for the court, not the arbitrator, to decide.

6

Applying this standard, the Ninth Circuit found "clear and unmistakable evidence" that the parties intended to arbitrate arbitrability in *Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011). In that case, a group of restaurant owners entered a contract with their investors regarding the allocation of profits from the sale of the restaurants. *Id.* at 983-84. This contract contained an arbitration clause which read, in relevant part:

> If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement or the validity or application of any of the provisions of this Section . . . , and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.

*Id.* at 984. When one of the investors filed suit alleging that the owners had mismanaged restaurant funds prior to the sale of the restaurant, the district court declined to compel arbitration, finding that the claims did not fall within the scope of the agreement to allocate profits from the sale, and that the arbitration clause in that agreement thus did not govern. *Id.* at 985. The Ninth Circuit reversed, finding that the section of the arbitration clause providing for the arbitration of "the validity or application of any of the provisions of this Section" clearly and unmistakably indicated an intent to arbitrate the question of whether a given dispute fell within the scope of the arbitration agreement. *Id.* at 988. The court thus found that the district court erred in failing to stay the action pending arbitration. *Id. See also Sadler v. Green Tree Servicing, LLC*, 466 F.3d 623, 624 (8th Cir.2006) (finding clear and unmistakable evidence that the parties intended to arbitrate arbitrability based on a contractual provision providing that "[a]ny controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s))."

In this case, the Letter of Understanding clearly provides that the arbitrators have "exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability." Docket No. 19-2. This is at least as clear an indication of the intent to arbitrate arbitrability as was contained in the contract in *Momot*. Additionally, the agreement provides for the arbitrability of "any dispute . . . with reference to the interpretation, application, formation, enforcement or validity of this memorandum." *Id.* This language is not distinguishable from the language in *Momot's* arbitration clause in any meaningful way.

7

Here, the Letter of Understanding concerns "outstanding disputes associated with the 3/31/00-3/31/05 Rolling Contractor Controlled Insurance Program (Swinerton Wrap-Up) and . . . the 8/01/01-7/31/02 Workers Compensation Program for Swinerton." Docket No. 19-2. As discussed above, the Letter of Understanding does not clearly define the scope of the Wrap-Up program, and the parties do not provide clarification of what the program entails. It appears that most or all of the events giving rise to the underlying suits occurred during the time range covered by the Wrap-Up program, but the Letter's failure to clearly define the program makes it difficult to determine whether the program covers all disputes under the insurance policies from this period of time, or whether it is narrower in scope. At first, this lack of clarity suggests that Defendants have failed to meet their burden of demonstrating by "clear and unmistakable evidence" that the parties intended to arbitrate the arbitrability of disputes like the one at bar. *Rent-A-Center*, 130 S. Ct. at 2777.

Plaintiffs, however, do not argue that the instant disputes do not fall within the scope of the Wrap-Up program. Instead, Plaintiffs argue that the Letter of Understanding covered only the five then-existing disputes specifically identified in the Letter, and that "the parties did not contemplate nor agree to the future application of deductibles or the reimbursement of overpayment of deductibles under the Wrap Up program as part of the Letter of Understanding." Pl.'s Supp. Br. at 7. Plaintiffs' argument that the Letter covers only the five specific disputes enumerated in the Letter (two of which pertain to non-workers' compensation loss adjustments) is inconsistent with the provision in the Letter stating that "Swinerton acknowledges that losses in the Swinerton Wrap Up program have not reached the Basket Aggregate Limit" and setting forth procedures for handling the payment of future deductibles, and the statement referencing the two non-workers' compensation adjustments as adjustments which "should be made at this time." Docket No. 19-2. This suggests that there are remaining disputes to be resolved, and that the five enumerated disputes is not exclusive. Plaintiffs' testimonial evidence to the contrary (which is disputed) is not persuasive. Hence, whether the dispute at bar is covered by the Letter and is arbitrable is for the arbitrators.

///

///

///

8

Thus, the Court finds that the Letter of Understanding provides clear and unmistakable evidence that the parties intended to arbitrate the arbitrability of dispute at bar.[1]

B. <u>Plaintiffs' Other Arguments</u>

In their opposition to the original motion, Plaintiffs raise several other arguments against the application of the arbitration clause in this case. First, Plaintiffs argue that bad faith claims against insurance carriers may not be arbitrated. Pl.'s Opp. at 20-21. The cases they cite for this proposition, however, announced no such general rule, though two of them did find bad faith claims outside the scope of the arbitration agreements under the specific facts there at issue. *See Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1047 (9th Cir. 2009); *UMG Recordings, Inc. v. Am. Home Assur. Co.*, 378 F. App'x 766, 767 (9th Cir. 2010). Two of the cases Plaintiffs cite in support of their argument do not discuss bad faith claims at all, but simply discuss whether the claims there at issue fall within the scope of the arbitration clauses before the court. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (finding that various claims that did not arise under the contract containing the arbitration clause were not subject to arbitration); *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 411 F.3d 669, 672 (6th Cir. 2005) (holding that disputes over deductibles were not arbitrable when arbitration clause only applied to agreement about the payment of premiums). Plaintiffs offer no discussion of these cases or explanation of how they are helpful to their position.

Plaintiffs also argue that this Court should not stay the claims because requiring arbitration would unnecessarily split Plaintiffs' claims and violate the primary right theory. Under California law, the primary right theory prevents a plaintiff from splitting claims arising out of the same "primary right" by filing multiple suits based on the same wrongful act of the defendant. *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 641-42 (2007). Plaintiffs' argument on this front, however, is premised on the fact that they have already filed another suit against Defendants "on the same insurance policies for the same causes of action based on Defendants' pattern and practice of breaching its duty to settle and overcharging its insureds for multiple deductibles." Pl.'s Opp. at 21-

---

[1] The fact that the parties did not sign the later 2000 Payment Agreement does not negate the Letter of Understanding.

9

22. Thus, to the degree that there are multiple parallel actions, it is because of Plaintiff's decision to file multiple actions. Plaintiffs offer no argument why ordering arbitration in this case would cause any greater "risk of inconsistent rulings" than allowing the two suits to both proceed in this Court.

Finally, Plaintiffs argue that arbitration should not be compelled because New York law is repugnant to California law in that it holds insureds to a higher standard in proving bad faith claims. While the arbitration clause provides that arbitration shall take place in New York, it does not provide that it is governed by New York law, and Defendants state that they are not arguing that New York law applies. Choice of law remains open for the arbitrators to decide.

This Court thus finds that Plaintiff's remaining arguments against the application of the arbitration clause to be meritless.

## IV. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Defendant's motion to stay this action pending the completion of arbitration. The Court further compels the parties to proceed with arbitration forthwith in accordance with the Letter of Understanding.

This order disposes of Docket No. 17.

IT IS SO ORDERED.

Dated: May 21, 2013

_____
EDWARD M. CHEN
United States District Judge

10